TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
SCOTT D. TENLEY (Cal. Bar No. 298911)
Assistant United States Attorney
     8000 United States Courthouse
     411 West Fourth Street
     Santa Ana, California 92701
     Telephone: (714) 338-2829
     Facsimile: (714) 338-3561
     E-mail:   scott.tenley@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>ANTHONY TRENELL LEWIS,<br>  aka "Ant,"<br>  aka "Big Ant,"<br><br>       Defendant. | No. SA CR 20-133-AB-1<br><br>OPPOSITION TO DEFENDANT ANTHONY <u>TRENELL LEWIS'S MOTION TO SUPPRESS</u><br><br>Hearing Date: April 23, 2021<br>Hearing Time: 1:00 p.m.<br>Location:    Courtroom of the<br>               Hon. Andre Birotte,<br>               Jr. |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Scott D. Tenley, hereby files its opposition to defendant Anthony Trenell Lewis's motion to suppress (CR 89 or "Mtn.").

This opposition is based upon the attached memorandum of points and authorities, the declarations of Scott D. Tenley and attached exhibits, the declaration of Ryan J. Stearman and attached exhibits, the declaration of Pedram Gharah and attached exhibits, the declaration of David Prewett, the files and records in this case, and such further evidence and argument as the Court may permit.

The declarations of Scott D. Tenley, Ryan J. Stearman, Pedram Gharah, and David Prewett are submitted concurrently with this memorandum, and are referred to herein as "Tenley," "Stearman," "Gharah," and "Prewett" followed by the appropriate paragraph or exhibit reference.

Dated: April 2, 2021                Respectfully submitted,

                                    TRACY L. WILKISON
                                    Acting United States Attorney

                                    BRANDON D. FOX
                                    Assistant United States Attorney
                                    Chief, Criminal Division

                                    _____/s/_____
                                    SCOTT D. TENLEY
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

**Contents**

TABLE OF AUTHORITIES................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   INTRODUCTION...................................................1

II.  STATEMENT OF FACTS.............................................2

     A.   Offense Conduct..........................................2

     B.   Execution of Search Warrant and Interview of Defendant....2

III. ARGUMENT.......................................................6

     A.   Defendant Was Not In Custody For Miranda Purposes.........6

          1.   Legal Standard......................................6

          2.   A Reasonable Person Would Have Felt Free to
               Terminate The Encounter and Leave...................9

          3.   The Interview Did Not Present the Same Inherently
               Coercive Pressures As Station House Questioning.....18

     B.   Even if the Interview Was Custodial, Defendant's
          Statements Should Not Be Suppressed.....................20

     C.   No Evidentiary Hearing is Required......................24

IV.  CONCLUSION....................................................25

# TABLE OF AUTHORITIES

DESCRIPTION                                                                    PAGE

**CASES**

Berkemer v. McCarty
    468 U.S. 420 (1984)....................................8, 9, 18

Edwards v. Arizona
    451 U.S. 477 (1981).......................................22

Howes v. Fields
    565 U.S. 499 (2012)...................................passim

Illinois v. Perkins
    496 U.S. 292 (1990)........................................6

Maryland v. Shatzer
    559 U.S. 98 (2010)........................................20

Michigan v. Harvey
    494 U.S. 344 (1990).......................................24

Minnick v. Mississippi
    498 U.S. 146 (1990).......................................24

Miranda v. Arizona
    384 U.S. 436 (1966).....................................6, 19

Oregon v. Bradshaw
    462 U.S. 1039 (1983)...................................22, 24

Oregon v. Elstad
    470 U.S. 298 (1985).......................................24

Oregon v. Mathiason
    429 U.S. 492 (1977)......................................9, 14

Stansbury v. California
    511 U.S. 318 (1994)........................................8

United States v. Bassignani
    575 F.3d 879 (9th Cir. 2009).........................8, 10, 14

United States v. Batiste
    868 F.2d 1089 (9th Cir. 1989).............................24

United States v. Bennett
    329 F.3d 769 (10th Cir. 2003).............................17

United States v. Beraun-Panez
    812 F.2d 578 (9th Cir. 1987)...........................15, 19

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

United States v. Booth
        669 F.2d 1231 (9th Cir. 1981).................................16

United States v. Butler
        249 F.3d 1094 (9th Cir. 2001).................................17

United States v. Carroll
        102 F. Supp. 3d 1134 (N.D. Cal. 2015).........................11

United States v. Chong
        2015 WL 5156438 (C.D. Cal. Sept. 2, 2015)..................7, 13

United States v. Craighead
        539 F.3d 1073 (9th Cir. 2008)..................................9

United States v. Crawford
        372 F.3d 1048 (9th Cir. 2004)..........................9, 14, 17

United States v. Davis
        530 F.3d 1069 (9th Cir. 2008).............................14, 21

United States v. Davis
        792 F.2d 1299 (5th Cir. 1986)..................................7

United States v. Eide
        875 F.2d 1429 (9th Cir. 1989).................................14

United States v. Fornia-Castillo
        408 F.3d 52 (1st Cir. 2005)...................................11

United States v. Gomez
        725 F.3d 1121 (9th Cir. 2013).................................24

United States v. IMM
        747 F.3d 754 (9th Cir. 2014)..............................11, 15

United States v. Kim
        292 F.3d 969 (9th Cir. 2002)...............................8, 10

United States v. Leese
        176 F.3d 740 (3d Cir. 1999)...................................16

United States v. Medina-Villa
        567 F.3d 507 (9th Cir. 2009)...................................7

United States v. Most
        789 F.2d 1411 (9th Cir. 1986).................................22

United States v. Rodriguez-Preciado
        399 F.3d 1118, 1127 (9th Cir. 2005)...........................21

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

<u>United States v. Wagner</u>
    951 F.3d 1232 (1st Cir. 2020)................................16

<u>United States v. Wardlow</u>
    951 F.2d 1115 (9th Cir. 1991)................................24

<u>United States v. Zapien</u>
    861 F.3d 971 (9th Cir. 2017)............................14, 21

**<u>RULES</u>**

Local Criminal Rule 12-1.......................................25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

On September 3, 2020, law enforcement officers executed a warrant to search defendant Anthony Lewis as he prepared to leave the parking garage of a Los Angeles hotel.  During an ensuing consensual interview, defendant was advised twice that he was not under arrest and given Miranda warnings.  Nevertheless, defendant now moves to suppress all statements made during that interview because, approximately 21 minutes into the interview, defendant said, "Then I need my attorney, man."

The motion should be denied.  As a threshold matter, defendant was not in "custody" for Miranda purposes and therefore his right to counsel did not attach.  Among other facts demonstrating the non-custodial nature of the interview: (1) defendant was told twice that he was not under arrest; (2) defendant was afforded two opportunities to decline the interview; (3) defendant was not handcuffed or restrained during the interview; (4) the interview took place in a public setting and defendant had the ability to terminate the interview and return to his vehicle or hotel room at any time; (5) the interview was relatively short; and (6) officers did not question defendant in a hostile, accusatory, or coercive manner.  A reasonable person under these circumstances would have felt free to terminate the interview and, even if not, the interview did not present the type of "inherently coercive pressures" of a station house interrogation that would require suppression.

Even if defendant was in custody for Miranda purposes, there is nothing to suppress.  Eleven minutes of inculpatory statements occurred after defendant waived his Miranda rights (a waiver which he

does not challenge) and <u>before</u> he purportedly invoked his right to counsel.  And, after defendant purportedly invoked his right to counsel, he immediately reinitiated the conversation thereby permitting officers to continue questioning defendant.

## II.   STATEMENT OF FACTS

### A.   Offense Conduct

In a series of text messages between June 16, 2020 and June 19, 2020, defendant organized a sham marijuana transaction between Victim-1 and co-conspirator Anthony Williams for the purpose of allowing Williams to rob Victim-1.  (CR 24 at Overt Acts 1-3.)  On June 20, 2020, Williams and co-conspirator John Revels met with Victim-1 inside of Victim-1's high-rise apartment building in Santa Ana, California.  (<u>Id.</u> at 11-12.)  Once inside, Williams and Revels "brandished handguns," "forced Victim-1 and Victim-2 into a bedroom[,] and bound their hands with zip-ties."  (<u>Id.</u> at 12-13.)  Williams and Revels then loaded approximately $120,000 of marijuana into duffle bags and fled.  (<u>Id.</u> at 15.)  Defendant received a portion of the robbery proceeds for his role in arranging the sham transaction.

### B.   Execution of Search Warrant and Interview of Defendant

On September 1, 2020, officers obtained warrants to search defendant, defendant's apartment in Florida, and defendant's vehicle in Florida.  (Stearman ¶ 2.)  Officers also obtained search and arrest warrants for Williams and Revels.[1]  (<u>Id.</u>)

---

[1] The warrants for Williams and Revels, like the warrants associated with defendant, were executed on the morning of September 3, 2020.  (Stearman ¶ 4.)  Williams and Revels have since pleaded guilty to participating in the robbery and are set to be sentenced by this Court within the next several months.

That same day, defendant traveled to Los Angeles from Florida, and checked into the Hilton Los Angeles Airport, located on Century Boulevard in Los Angeles ("Hilton LAX" or the "hotel"). (Stearman ¶ 3; Gharah ¶ 2.)  On September 2, 2020, officers conducting surveillance of defendant observed him park his Jeep Wrangler in the hotel's underground parking garage, and walk toward the elevator bay leading to the hotel lobby with a backpack on his shoulders. (Gharah ¶ 3 & Exs. 5, 6.)

On September 3, 2020, officers positioned themselves at various locations in and around the hotel for purposes of executing the search warrant on defendant's person. (Stearman ¶ 5; Gharah ¶ 4.) At approximately 6:20 a.m., an officer positioned in the parking garage observed defendant walking toward the Jeep carrying a cellular telephone and backpack. (Stearman ¶ 6; Gharah ¶ 5.)  At that point, Fullerton Police Department Sergeant Pedram Gharah and ATF Special Agent Ryan Stearman drove down into the parking garage from their position on a side street outside of the hotel. (Stearman ¶ 7; Gharah ¶ 6.)  When they reached defendant's location, Sgt. Gharah and Agent Stearman parked their unmarked vehicles in the traffic lane behind defendant's Jeep and, to alert defendant to their presence, activated their lights and chirped the siren once. (Stearman ¶ 8; Gharah ¶ 7.)

Sgt. Gharah approached the driver's side of the Jeep, calmly identified himself as police, and confirmed defendant's identity. (Gharah ¶ 8.)  Agent Stearman approached the passenger side of the Jeep to cover Sgt. Gharah with his firearm braced on this chest (but not pointed at defendant or the Jeep). (Stearman ¶ 9.)  Sgt. Gharah directed defendant to step out of the vehicle.  Defendant was fully

3

cooperative, and walked to the back of the Jeep.  (Gharah ¶ 8.)  Sgt. Gharah then conducted a 15-second pat down defendant for weapons, using light pressure to clasp defendant's hands behind defendant's back as he did so.  (Id. at ¶ 9.)  Defendant was then instructed to wait by the back of the Jeep.  (Id. at ¶ 11.)  At some point, the Jeep's tailgate was opened so defendant could sit inside as he waited.  (Id.)  During this time, defendant was never handcuffed or placed inside of a police vehicle.  (Id. at ¶ 9; Stearman ¶ 11.)  He waited approximately three to five minutes as officers cleared the area of police vehicles and Agent Stearman and Santa Ana Police Department Detectives David Prewett and Ernesto Solorio prepared to interview defendant.  (Stearman ¶ 14-15; Gharah ¶ 12-14.)

The recorded interview commenced at 6:27 a.m.  (Tenley Ex. 1 ("Recorded Interview").)  Only Agent Stearman, Det. Prewett, and Det. Solorio participated.  (Stearman ¶ 12; Prewett ¶ 5.)  All other officers had left the garage or were in the process of doing so as the interview began.  (Stearman ¶ 16.)

During the interview, defendant stood with his back facing the Jeep.  (Stearman ¶ 17; Prewett ¶ 7.)  The officers faced defendant, with their backs to the traffic lane.  (Id.)  The parking garage was open to the public.  (Stearman ¶ 19; Prewett ¶ 10.)  Defendant was not isolated, as other vehicles can be heard throughout the interview.  (See Recorded Interview.)  During the interview, defendant had an unobstructed path to return to the driver's seat of his Jeep or to walk back to the elevator bay that led to the hotel lobby and, by extension, to his hotel room.  (Stearman ¶ 17; Prewett ¶ 9; see also Tenley Ex. 3 (photographs depicting the location of the interview from various angles, including the proximity of the

4

interview location to the elevator bay at page 5).)  Defendant's

backpack was on the ground near defendant's feet.  (Stearman ¶ 18.)

For the first 11 minutes of the interview, Agent Stearman

gathered biographical information and information necessary to

complete the search warrant inventory form.  (See Stearman ¶ 21 & Ex.

4; Tenley Ex. 2 (interview transcript or "Tx.") 10.)  Defendant was

asked whether he had time to speak with officers.  (Tx. 5) (Stearman:

"Uh, you got a few minutes to talk to us?").  Defendant responded, "I

have all the time in the world, apparently."  (Id.)  Defendant was

twice told that he was not under arrest.  (Tx. 6, 11.)  After the

second advisement, Agent Stearman read defendant his Miranda rights.

(Tx. 11-12.)  Defendant indicated he understood.  (Tx. 12.)

Agent Stearman (with Det. Prewett interjecting several times)

then proceeded to interview defendant for approximately 28 minutes

about the robbery and related activity.  (Tx. 12-53.)  The officers

questioned defendant in courteous, professional, and non-aggressive

manner.  As pertinent here, at one point, Agent Stearman confronted

defendant about his shifting statements about what proceeds defendant

received from the robbery.  (Tx. 29.)  Defendant raised his voice in

response and said, "Then I need my attorney, man.  I, I, I don't know

what — you, you guys are sitting here in my face, man, things are

going through my head, you know what I mean?  Like . . . its – yeah."

(Id.)  After Agent Stearman responded, "take your time," defendant

continued to discuss robbery proceeds for another 30 seconds without

any further questioning from officers.  (Id. at 29-30.)

When the interview started to wrap up, defendant consented to

the search of a second cellular telephone (Tx. 54) and Agent Stearman

updated the search warrant inventory form accordingly (Tx. 58;

Stearman ¶ 22 & Ex. 4).  As he did so, there were several isolated questions regarding the investigation.  (See, e.g., Tx. 56.) Defendant then asked for telephone numbers from the cellular telephones that were seized.  (Tx. 59.)  For the next 9 minutes, Agent Stearman prepared a handwritten list of names and numbers from defendant's cellular telephones.  (Stearman ¶ 22; Tx. 59-66.)

Once that process was complete, Det. Solorio, Agent Stearman, and defendant briefly chatted about defendant's plan to open a restaurant in Florida.  (Tx. 67-69.)  Unprompted, defendant returned to the subject to Anthony Williams (or "Tone"), and five additional minutes of questions related to the robbery ensued.  (Tx. 69-74.)  As the interview ended, Agent Stearman made himself available to provide additional telephone numbers if needed.  When the interview concluded, defendant was not arrested.  He returned to his Jeep. (Prewett ¶ 11.)

## III. ARGUMENT

### A.   Defendant Was Not In Custody For Miranda Purposes

#### 1.   Legal Standard

The government "may not use statements . . . stemming from custodial interrogation of the defendant" unless the defendant has been provided with Miranda warnings aimed at securing the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  It is axiomatic that Miranda only applies when a defendant is subject to "custodial interrogation," meaning "'questioning initiated by law enforcement officers after a person has been taken into custody.'"  Illinois v. Perkins, 496 U.S. 292, 296 (1990) (quoting Miranda, 384 U.S. at 444).  "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a

serious danger of coercion." <u>Howes v. Fields</u>, 565 U.S. 499, 508-09 (2012).  Whether a defendant is in "custody" is considered a "threshold inquiry" and the courts "do not reach the question of whether a defendant properly waived his <u>Miranda</u> rights unless [they] determine that a defendant was in custody, and therefore had a right to be given the <u>Miranda</u> warnings." <u>United States v. Medina-Villa</u>, 567 F.3d 507, 518, n.5 (9th Cir. 2009).  Defendant bears the burden of establishing that he was in custody for <u>Miranda</u> purposes.  <u>See</u> <u>United States v. Davis</u>, 792 F.2d 1299, 1308 (5th Cir. 1986).[2]

To determine whether an individual is in custody for <u>Miranda</u> purposes, the Supreme Court has identified a two-step inquiry. <u>Fields</u>, 565 U.S. at 509.  "[T]he initial step is to ascertain whether . . . a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave" by "examin[ing] all of the circumstances surrounding the interrogation," including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." <u>Id.</u> (cleaned up).  If a reasonable person would have felt free to terminate the encounter and leave, then the person was not in custody and the inquiry is complete.  <u>Id.</u>  If a reasonable person would not feel free to leave, then the court must "ask the

---

[2] The party bearing the burden of establishing whether or not a defendant was in "custody" for <u>Miranda</u> purposes is unsettled in the Ninth Circuit.  As this Court recognized in <u>United States v. Chong</u>, 2015 WL 5156438 (C.D. Cal. Sept. 2, 2015) (Birotte, J.), <u>Smith</u>'s approach to the "custody" burden is akin to Fourth Amendment standing requirements "which also places the 'threshold' burden on the Defendant to prove the foundational requirement before shifting the burden to the Government to prove its action was constitutionally justified." <u>Id.</u> at n.4.  To the extent the burden of proof becomes relevant, the government submits that defendant should bear it.

1    additional question whether the relevant environment present[ed] the

2    same inherently coercive pressures as the type of station house

3    questioning at issue in Miranda." Id.

4        In the context of a valid investigatory stop, the Supreme Court

5    has "decline[d] to accord talismanic power to the freedom-of-movement

6    inquiry." Id. (citing Berkemer v. McCarty, 468 U.S. 420, 437 (1984))

7    (quotation marks omitted). Instead, the Supreme Court has held that

8    Miranda warnings are only required if the totality of the

9    circumstances shows that a reasonable person would understand that he

10   was subject to "a formal arrest or restraint on freedom of movement

11   of the degree associated with a formal arrest." Stansbury v.

12   California, 511 U.S. 318, 322 (1994) (citation and quotation marks

13   omitted).

14       In addition to the factors identified by the Supreme Court in

15   Fields, the Ninth Circuit has identified additional factors as being

16   relevant to the custody analysis, including "(1) the language used to

17   summon the individual; (2) the extent to which the defendant is

18   confronted with evidence of guilt; (3) the physical surroundings of

19   the interrogation; (4) the duration of the detention; and (5) the

20   degree of pressure applied to detain the individual." United States

21   v. Kim, 292 F.3d 969, 974 (9th Cir. 2002) (internal quotation marks

22   omitted). These factors are "not exhaustive." United States v.

23   Bassignani, 575 F.3d 879, 884 (9th Cir. 2009). Indeed, "[o]ther

24   factors may also be pertinent . . . and even dispositive." Kim, 292

25   F.3d at 974.

26       Whether a defendant was in custody is an objective inquiry and

27   is not based on the subjective views of either the interrogating

28   officer or of the person being questioned. Stansbury, 511 U.S. at

8

1   323; <u>Berkemer</u>, 468 U.S. at 442.  It does not matter that officers

2   suspected defendant of committing a crime, <u>Oregon v. Mathiason</u>, 429

3   U.S. 492, 495 (1977), or hoped to illicit an incriminating statement,

4   <u>Berkemer</u>, 468 U.S. at 442.

5               2.   <u>A Reasonable Person Would Have Felt Free to Terminate</u>

6                    <u>The Encounter and Leave</u>

7        Defendant's motion should be denied because he cannot satisfy

8   the first step of the <u>Fields</u> inquiry: whether, based on the totality

9   of the circumstances, a reasonable person would have felt he was not

10  free to terminate the encounter and leave.  An analysis of those

11  considerations deemed relevant under <u>Fields</u> and <u>Kim</u> confirms that:

12  (1) defendant voluntarily participated in an interview he was free to

13  terminate at any time; and (2) defendant was not subject to a

14  "restraint on freedom of movement of the degree associated with a

15  formal arrest."  As such, he was not in custody for <u>Miranda</u> purposes.

16       <u>First</u>, and "[p]erhaps most significant for resolving the

17  question of custody," is the fact that defendant was twice "expressly

18  told he was not under arrest."  <u>United States v. Crawford</u>, 372 F.3d

19  1048, 1059-60 (9th Cir. 2004) (en banc) (finding no custody where

20  "the suspect is told that he is not under arrest and is free to

21  leave, and he does in fact leave without hindrance"); <u>see also</u> <u>United</u>

22  <u>States v. Craighead</u>, 539 F.3d 1073, 1087 (9th Cir. 2008) ("If a law

23  enforcement officer informs the suspect that he is not under arrest,

24  that statements are voluntary, and that he is free to leave at any

25  time, this communication greatly reduces the chance that a suspect

26  will reasonably believe he is in custody.").  Agent Stearman told

27  defendant <u>twice</u> that he was not under arrest (Tx. 6, 11), which

28  defendant understood (Tx. 6).  While defendant was not advised he was

                                      9

"free to leave," the absence of that advisement does not undermine the import of Agent Stearman's statements that defendant was not under arrest.  See Bassignani, 575 F.3d at 881 (no custody where defendant led to workplace conference room and told he was not under arrest, but was not told "explicitly that he was free to leave").  Moreover (and as discussed immediately below), because Agent Stearman opened the interview by emphasizing its voluntary nature twice, defendant's freedom to decline the interview and leave was implied.

Second, defendant voluntarily participated in the interview; he was not required or commanded to do so.  See Kim 292 F.3d at 974 (identifying "the language used to summon the individual" as the first relevant factor to consider).  After Agent Stearman provided defendant a copy of the warrant, the following exchange ensued:

| STEARMAN: | Uh, **you got a few minutes to talk to us**? |
| DEFENDANT: | I have all the time in the world, apparently. |
| STEARMAN: | **I want to make sure, uh, that's good with you.**  You're not under arrest.  I just— [Voices overlap] |
| DEFENDANT: | Yeah, I'd, I'd have cuffs on me. |

(Id. at 5-6 (emphasis added).)  Defendant not only confirmed he had "a few minutes" to speak with officers, he also confirmed that the interview was "good with [him]."  (Id.)  In other words, defendant had two opportunities to decline to participate in the interview. This is a far cry from the circumstances in Kim, in which the defendant was ordered to "shut up," sequestered, and then questioned in a language she did not understand.  292 F.3d at 973-76.

Third, defendant was never handcuffed or restrained during the interview.  See Fields, 565 U.S. at 509 (considering "the presence or

10

absence of physical restraints during the questioning"). Although defendant was restrained for approximately 15 seconds at the outset of the encounter while Sgt. Gharah conducted a pat down for weapons (Gharah ¶ 9), that measure was necessary for officer safety given the primary offense under investigation: a violent, armed robbery. Moreover, when clasping defendant's hands behind defendant's back, Sgt. Gharah "used minimal pressure because [defendant] was cooperative and did not resist in any way." (Id.)  This brief, limited physical restraint does not render the interview custodial, particularly where courts have deemed interviews non-custodial with far more significant acts of restraint. See United States v. Fornia-Castillo, 408 F.3d 52, 63-65 (1st Cir. 2005) (holding that suspect was not in custody even though officers approached him with guns drawn and handcuffed him for 10 or 15 minutes before handcuffs were removed). And, the relevant Fields factor considers restraints "during" questioning, not before questioning. 565 U.S. at 509.

Fourth, defendant was interviewed in a public setting and had multiple means of egress if he had decided to terminate the interview. The interview occurred in a public, underground parking garage with members of the public in the vicinity. (Stearman ¶ 19; Prewett ¶ 10.)  The parking garage was expansive with an open-style layout. (See Tenley Ex. 3 at 1-4 (post-interview photographs of the area in which the interview occurred).)  This stands in contrast to those types of small, isolated environments that are more akin to a functional arrest. Compare United States v. IMM, 747 F.3d 754, 767-68 (9th Cir. 2014) (questioning in "small room with door closed" that appeared to be locked); and United States v. Carroll, 102 F. Supp. 3d 1134, 1138-39 (N.D. Cal. 2015) ("police directed [defendant] to sit

11

1   in the corner of windowless room, and placed themselves and a table

2   between [defendant] and the only door").

3       Defendant also had a number of means of leaving the area if he

4   had chosen to terminate the interview.  Agents were not blocking

5   defendant's path to return to the Jeep as he contends (see Mtn. at

6   5).  To the contrary, defendant stood between the Jeep and officers

7   (Stearman ¶ 17; Prewett ¶ 8), meaning that all defendant had to do to

8   re-enter the Jeep was turn around and walk several feet (see Gharah

9   Ex. 5 (depicting defendant's Jeep and location of interview)).  No

10  one or thing prevented defendant from re-entering the Jeep.

11  (Stearman ¶ 17; Prewett ¶ 9).  Relatedly, there is no evidence that

12  officers confiscated the keys to Jeep (Stearman ¶ 12; Prewett ¶ 8;

13  Gharah ¶ 10), but instead the record suggests the keys were likely

14  left inside the Jeep and therefore immediately accessible to

15  defendant (Gharah ¶ 10).

16      Defendant also could have returned to his hotel room if he

17  decided to terminate the encounter.  Officers were not blocking

18  defendant's path to return to the elevators that led to the Hilton

19  LAX lobby, which were located behind defendant, several hundred feet

20  away.  (Stearman ¶ 17; Prewett ¶ 9; Tenley Ex. 3 at 5 (photograph

21  depicting location of interview on far right and location of

22  elevators on far left).)  At the time of the interview, defendant was

23  still checked into the hotel, and did not check out until two days

24  later.[3]  (Gharah ¶ 2 & Ex. 7.)  In that regard, defendant's argument

25  that officers "had a search for [defendant's] home" (Mtn. 5) – as if

26

27  _____

28      [3] It appears defendant's rolling luggage (see Stearman ¶ 3) was
    still in the hotel room as there is no indication it was in the Jeep
    or in anyway in the vicinity of the interview.

                                    12

to suggest defendant had no residence to which he could return – is misleading.  The search warrant pertained to defendant's apartment in Florida, not any residence in California.  (Stearman ¶ 2.)  Thus, even though there was a residential search warrant in play, it could not have impacted whether a reasonable person would have felt free to leave.

Defendant suggests he could not leave the interview because officers "took [his] bag from his possession, which contained among other things his telephone and wallet with his identification." (Mtn. 5.)  This is wrong and without factual support.  Defendant's telephones were seized pursuant to the warrant.  (See Stearman Ex. 4.)  Defendant's backpack and wallet were never "taken" from him – instead the backpack and wallet were on the ground near defendant's feet during the interview.  (Stearman ¶ 18; see Prewett ¶ 8.)  There was nothing that prohibited defendant from terminating the interview, picking up his bag, and leaving.[4]  (See id.)

Fifth, the duration of the detention and interview is consistent with other cases were courts have found interviews to be non-custodial.  Defendant was initially detained for a 3 to 5 minute period before the interview commenced.  (Stearman ¶ 15; Gharah ¶ 14.) The recorded interview lasted 65 minutes (Tenley Ex. 1), bringing the total time of the encounter to 68 to 70 minutes.  Within that 65-minute interview, only approximately 35 minutes are devoted to questioning regarding the robbery, from 11:15 to 40:12 and from 59:40

---

[4] Cf. Chong, 2015 WL 5156438, at *13 (this Court finding the defendant not in custody where, among other things, officers told defendant "not to touch the papers" found in his vehicle).

13

to 1:04:50.[5]  (See Recorded Interview; Tx.)  Defendant's interview was therefore either shorter than or roughly comparable to interviews that both the Supreme Court and the Ninth Circuit have held to be non-custodial.  See, e.g., Fields, 565 U.S. at 515 (holding that a prisoner who had been interviewed for between five and seven hours was not in custody); Crawford, 372 F.3d at 1052, 1060 (holding that the defendant was not in custody where he was interviewed for "more than an hour").[6]

Sixth, the tenor of the interview reflects its non-custodial nature.  The interview was conducted in a professional, courtesy, and largely non-confrontational manner.  Officers never adopted "an aggressive, coercive, [or] deceptive tone."  Bassignani, 575 F.3d at 884 (holding this factor weighs against a finding of custody where the two-and-a-half-hour interview of defendant "was conducted in an open, friendly tone" where the defendant "participated actively").  Defendant was never threatened or led to believe that he would be placed under arrest or prosecuted at the conclusion of the interview.  Compare United States v. Eide, 875 F.2d 1429, 1437 (9th Cir. 1989) (holding that Miranda warnings were not required where the

---

[5] The first 11 minutes of the recording pertain to warrant- and booking-related questioning which is not subject to Miranda.  See United States v. Zapien, 861 F.3d 971, 976 (9th Cir. 2017); United States v. Davis, 530 F.3d 1069, 1081-82 (9th Cir. 2008).  Nine minutes of the recording cover Agent Stearman, as a courtesy, preparing a handwritten list of telephone numbers for defendant since defendant's cellular telephones were seized.  (Tx. 59-66.)  The remaining portions of the recording are unrelated to the robbery.

[6] See also Mathiason, 429 U.S. at 495 (holding that the defendant was not in custody when he left the police station "[a]t the close of a 1/2-hour interview"); Bassignani, 575 F.3d at 884 (holding that the defendant was not in custody even though he was interviewed for two and half hours); Eide, 875 F.2d at 1432, 1437 (holding that the defendant's 90-minute meeting with law enforcement was non-custodial).

defendant's meeting with law enforcement was "amicable") with IMM, 747 F.3d at 760 (concluding that defendant would not have felt free to terminate the encounter where, among other factors, the "questioning was both hostile and accusatory").  As reflected in the recording, defendant was not frightened or intimidated during the interview, but was instead engaged in a conversation with officers.

Officers did advise defendant of various facts connecting him to the robbery under investigation during the interview.  (See, e.g., Tx. 20, 23, 24, 25, 32).  These references, however, all arose within the context of a give-and-take conversation about the events at issue.  Officers did not, by contrast, aggressively confront defendant with evidence in an effort to brow-beat a confession from him.  Compare United States v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir. 1987) (finding the defendant in custody where he was repeatedly accused of lying, confronted with false or misleading witness statements, and continually asked for the "truth" until he gave the answers the officers sought).  Instead, defendant was advised of certain facts known to officers, including facts that contradicted some of defendant's false statements during the interview.  And, while Agent Stearman made a brief comment that defendant had violated "a couple of US laws" (Tx. 4), that comment was brief and came within the context of the execution of the federal search warrant for defendant, which necessarily entailed a judicial finding of probable cause that defendant had violated federal laws pertaining to robbery affecting commerce, the use of firearms, drug trafficking, and money laundering as reflected on the search warrant cover sheet.

Seventh, as to "the release of the interviewee at the end of the questioning," Fields, 565 U.S. at 509, there is no dispute that

defendant was released when the interview concluded, supporting a
finding that the interview was non-custodial.  United States v.
Leese, 176 F.3d 740, 744 (3d Cir. 1999) (finding no custody where,
"[n]ot only was Leese told that she was not under arrest before the
questioning began, but she was specifically informed that when the
questioning was concluded the inspectors would be returning to
Harrisburg and she would not be going with them.").  Moreover, the
interview concluded with defendant discussing future cooperation with
officers (Tx. 66 ("So, if I have any information, just call you?)),
which further undermines any suggestion that the interview was
custodial.  United States v. Wagner, 951 F.3d 1232, 1250 (1st Cir.
2020) ("Case law is well established that a suspect is not in custody
when he voluntarily cooperates with the police.") (cleaned up).

Although defendant raises no arguments concerning his initial
detention by officers (and he should not be permitted to raise such
arguments for the first time on reply), the circumstances of
defendant's detention do not render the interview custodial.
Defendant was approached in the parking garage by two officers,
neither of whom acted aggressively or shouted.  (See Stearman ¶ 10;
Gharah ¶ 8.)  While both appear to have drawn (but not pointed) their
weapons, that was entirely reasonable where defendant was suspected
of participating in a violent robbery conspiracy.  United States v.
Booth, 669 F.2d 1231, 1236 (9th Cir. 1981) ("Strong but reasonable
measures to ensure the safety of the officers or the public can be
taken without necessarily compelling a finding that the suspect was
in custody.").  Defendant was never handcuffed, but only lightly
restrained for 15 seconds while Sgt. Gharah performed a pat down
search.  (See Gharah ¶ 9.)  And, although approximately five unmarked

police vehicles parked near defendant's Jeep during that initial three to five minute period, those vehicles were cleared before the interview, and the police presence during the interview was limited to the three interviewing officers.  (Stearman ¶ 16; Gharah ¶ 13; Prewett ¶ 7.)  This initial three to five minutes detention did not render the remaining 65-minute interview custodial.  As the Ninth Circuit has observed, "[t]he case books are full of scenarios in which a person is detained by law enforcement officers, is not free to go, but is not 'in custody' for Miranda purposes."  United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001).

Moreover, the Ninth Circuit has made clear that it is the "circumstances surrounding the interrogation" that should be examined, not a prior period of detention from which defendant had been released.  Crawford, 372 F.3d at 1059-60.  In Crawford, the Ninth Circuit found that the defendant's detention during a parole search where officers entered his room with weapons drawn "did not transform the later events at the FBI office into custodial interrogation."  Id.  In United States v. Bennett, 329 F.3d 769 (10th Cir. 2003), the Tenth Circuit held that the defendant was not in custody after initially being ordered to the ground and handcuffed with guns pointed at him at the outset of the search warrant's execution, because his handcuffs were subsequently removed and he was told he was not under arrest and did not have to answer questions. Id. at 772-75.  As in Crawford and Bennett, defendant's initial detention ended when Agent Stearman asked defendant whether he had "a few minutes" to speak with officers and twice advised defendant he was not under arrest.  All of these things communicated to him, both explicitly and implicitly, that he was free to leave.

17

* * *

All of the factors identified by the Supreme Court in <u>Fields</u> and the Ninth Circuit in <u>Kim</u> indicate that a "reasonable [person] in the [defendant]'s position would have understood" that he was free to terminate the encounter and leave. <u>Berkemer</u>, 468 U.S. at 442. Defendant was twice advised that he was not under arrest, he was twice given the option of declining to participate in the interview, he had an unobstructed path to return to his vehicle and/or his hotel room at any time, officers did engage in coercive, hostile, or aggressive questioning, and the relatively brief interview was conducted in a public place. Under those circumstances, the Court should find that defendant was not in custody for <u>Miranda</u> purposes.

### 3.   The Interview Did Not Present the Same Inherently Coercive Pressures As Station House Questioning

Because, under the totality of the circumstances, defendant would have felt free to terminate the interview, he was not in custody for purposes of <u>Miranda</u>.  However, even assuming that a reasonable person would not feel free to leave, defendant was still not in custody because the interview environment did not present "the same inherently coercive pressures as the type of station house questioning at issue in Miranda." <u>Fields</u>, 565 U.S. at 509 ("Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last [as] [n]ot all restraints on freedom of movement amount to custody for purposes of Miranda.").

In assessing whether defendant experienced the same coercive pressures presented by a station house questioning, the <u>Miranda</u> opinion is instructive as it contains a detailed discussion of "the

18

nature and setting of . . . in-custody interrogation."  384 U.S. at

445-56.  Specifically, <u>Miranda</u> highlights the following coercive

features of a station house interrogation:

- The interrogation "take[s] place incommunicado," resulting in "a gap in our knowledge as to what in fact goes on in the interrogation room."  <u>Id.</u> at 445, 448.

- The interrogation takes place "in the investigator's office or at least in a room of his own choice."  <u>Id.</u> at 449-50 (internal marks omitted).

- During the interrogation, "[t]he guilt of the subject is . . . posited as a fact" and the police officer "direct[s] his comments toward the reasons why the subject committed the act, rather than . . . asking the subject whether he did it."  <u>Id.</u> at 450.

- The police officer "interrogate[s] steadily and without relent  . . . for a spell of several hours."  <u>Id.</u> at 451.

- "When normal procedures fail to produce the needed result, the police . . . resort to deceptive stratagems such as giving false legal advice."  <u>Id.</u> at 455.

- "The police . . . persuade, trick, or cajole [the subject] out of exercising his constitutional rights."  <u>Id.</u>

    The coercive pressures highlighted in <u>Miranda</u> were not present

during defendant's interview by any stretch of the imagination.  He

was not placed under arrest before, during, or after the interview,

and was twice told that he was <u>not</u> under arrest.  Defendant was not

questioned for hours on end, but for 35 minutes.  Officers did not

engage in deceptive or coercive tactics and did not posit defendant's

guilt as fact.  Indeed, nothing in the interview constituted "tactics

to force a person questioned to succumb to the will of the

interrogators" or gave "rise to a phycological coercion beyond that

inherent in a typical noncustodial interview."  <u>Compare</u> <u>Beraun-Panez</u>,

812 F.2d at 580 (defendant in custody where officers "[a]ccus[ed]

Beraun-Panez repeatedly of lying, confront[ed] him with false or

misleading witness statements, employ[ed] good guy/bad guy tactics,

1   [took] advantage of Beraun-Panez's insecurities about his alien
2   status, ke[pt] him separated from his co-worker in a remote rural
3   location, [and] insist[ed] on the 'truth' until he told them what
4   they sought").  Rather, most questions were open-ended requests for
5   factual information about the events at issue.  The interview did not
6   take place in a police interrogation room, but in a public parking
7   garage connected to defendant's hotel and by extension his hotel
8   room.  Moreover, the garage was chosen not to gain any psychological
9   advantage over defendant, but because it was where defendant was
10  located the morning of the planned warrant executions.  And because
11  the interview was recorded, there is no secret as to "what in fact
12  [went] on in the interrogation room[]."  Id. at 448.

13       As the Supreme Court has repeatedly recognized, "[v]oluntary
14  confessions are not merely a proper element in law enforcement" but
15  "an unmitigated good essential to society's compelling interest in
16  finding, convicting, and punishing those who violate the law."
17  Maryland v. Shatzer, 559 U.S. 98, 1222 (2010) (quotations omitted).
18  Accordingly, the Miranda doctrine should be "enforced strictly, but
19  only in those types of situations in which the concerns that powered
20  the decision are implicated."  Fields, 565 U.S. at 514 (internal
21  marks omitted).  Here, because defendant's interview does not contain
22  "the same inherently coercive pressures" that animated the holding in
23  Miranda, defendant was not in "custody" for Miranda purposes.

24       **B.   Even if the Interview Was Custodial, Defendant's Statements**
25            **Should Not Be Suppressed**

26       None of defendant's interview statements should be suppressed
27  even if defendant was in "custody" for Miranda purposes.  The opening
28  eleven minutes of the recording (up to the point where defendant is

read his <u>Miranda</u> rights) did not require <u>Miranda</u> warnings.  During this segment of the interview, Agent Stearman explained the search warrant to defendant and posed routine, booking-type questions related to defendant's place of residence, address, biographical information, and vehicle.  These types of questions do not constitute "interrogation" for <u>Miranda</u> purposes and thus need not be preceded by <u>Miranda</u> warnings.  <u>See</u> <u>Zapien</u>, 861 F.3d at 976 (officer's questions about defendant's name, birth date, and residence within routine booking exception because questions were biographical and unlikely to produce incriminating responses); <u>Davis</u>, 530 F.3d at 1081-82 (<u>Miranda</u> warnings not required because police asked basic investigatory questions during execution of search warrant).

Defendant's statements from 11:13 until he said, "Then I need my attorney, man" (approximately 21:49) should not be suppressed because those statements were made <u>after</u> defendant knowingly and voluntarily waived his <u>Miranda</u> rights.  Agent Stearman advised defendant of his <u>Miranda</u> rights and defendant indicated that he understood those rights.  (Tx. 12.)  In his motion, defendant does not challenge the content of the <u>Miranda</u> warnings, nor does he suggest he did not knowingly and voluntarily waive those rights.  <u>See</u> <u>United States v. Rodriguez-Preciado</u>, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005) (implied waiver).  Accordingly, there is no basis to suppress statement made from 11:13 to 21:49 of the recording.

Finally, there is no basis to suppress defendant's statements after he said, "Then I need my attorney, man."[7]  (<u>See</u> Mtn. 6.)  As

---

[7] The government assumes for purposes of this memorandum that defendant's statement is an unambiguous invocation of his right to counsel.  However, for many of the reasons discussed herein –
*(footnote cont'd on next page)*

explained by the Supreme Court in <u>Edwards v. Arizona</u>, police are
prohibited from subjecting a suspect in custody who has invoked his
right to counsel from further interrogation "until counsel has been
made available to him, <u>unless</u> the accused himself initiates further
communication, exchanges, or conversations with the police."  451
U.S. 477, 484-85 (1981) (emphasis added).  A plurality of the Court
later clarified in <u>Oregon v. Bradshaw</u> that the prosecution must
perform two inquiries where a custodial subject has incriminated
himself after invoking the right to counsel: first it must show that
there was no violation of the <u>Edwards</u> rule – that is, that the
subject voluntarily initiated conversation with the police – and,
second, it must show that this initiation amounted to a knowing,
intelligent, and voluntary waiver.  462 U.S. 1039, 1045-46 (1983);
<u>United States v. Most</u>, 789 F.2d 1411, 1416-17 (9th Cir. 1986).

    Both requirements of <u>Bradshaw</u> are satisfied here.  There can be
no dispute that defendant voluntarily reinitiated dialogue with
officers immediately after he invoked his right to counsel.  The
relevant exchange is as follows:

| | |
|---|---|
| STEARMAN: | Let's clear this up, then. Because your first statement was that he gave you five thousand dollars.  Then you just told me he gave you four pounds and it's - |
| DEFENDANT: | Then I need my attorney, man.  I, I, I don't know what — you, you guys are sitting here in my face, man, things are going through my head, you know what I mean? Like . . . it's — yeah — |
| STEARMAN: | Well, take, take your time. |
| DEFENDANT: | You know, so. Um, he didn't give me, he didn't really give me no money.  You know? I — that was just like an estimation.  I don't know. |

including because defendant did not even pause to allow counsel to
arrive – his invocation could be considered ambiguous.

| | | |
|---|---|---|
| 1 | STEARMAN: | Okay. |

DEFENDANT:  He said he had some — he said he had some, uh,
few pounds or whatever, and I told him I would,
you know, describe to me, I'll just, you know,
send him some money or, you know, buy it from him
or somethin', but that never really came to
fruition.  Started crying, he needed some rent
money, he got to pay his rent and all this
bullshit, so I sent him some money for the rent,
but it wasn't really . . . you know, uh — there
wasn't really no — I don't know. I don't know how
to put it.

(Tx. 29-30.)  As this exchange reflects, immediately after saying
"Then I need my attorney, man," defendant continued explaining, for
42 seconds, what proceeds he had received from the robbery without
further interrogation by Agent Stearman.  Agent Stearman only said
"take your time" and "okay" – phrases that do not constitute
"interrogation" under Miranda.  Once defendant provided this lengthy
response, officers were permitted to continue questioning him despite
his request for counsel.

The circumstances here also indicate that defendant knowingly
and voluntarily waived his right to have an attorney present for
continued questioning.  Defendant's Miranda waiver occurred just ten
minutes earlier, meaning that defendant's Miranda rights were fresh
in his mind.  Additionally, by continuing to make unprompted
statements before an attorney arrived or before officers could even
attempt to make an attorney available to defendant, defendant
demonstrated that he had no intent to be represented by an attorney
at that time, and was therefore knowingly waiving his right to one.

The circumstances here are markedly different than those in
Edwards, the primary case upon which defendant relies.  (See Mtn. at
6.)  "In Edwards, the defendant had voluntarily submitted to
questioning but later stated that he wished an attorney before the

23

discussions continued. The following day detectives accosted the defendant in the county jail, and when he refused to speak with them he was told that he had to talk." Bradshaw, 462 U.S. at 1043. The facts here do not resemble Edwards at all, as defendant was not compelled in any way to continue speaking with officers. Moreover, the rule of Edwards is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990). It ensures that any statement made in subsequent interrogation is not the result of coercive pressures. Minnick v. Mississippi, 498 U.S. 146 (1990). Here, officers did not "badger" defendant into waiving his right to counsel or place any type of coercive pressure on defendant. Because Bradshaw is satisfied, these statements should not be suppressed.

Finally, even if the Court somehow concludes that all of defendant's statements must be suppressed – which the government respectfully submits is without any legal basis – the law permits the government to use defendant's statements for impeachment purposes should he testify at trial. Oregon v. Elstad, 470 U.S. 298, 307 (1985); United States v. Gomez, 725 F.3d 1121, 1126 (9th Cir. 2013) ("[A] defendant's voluntary statements — even if obtained in violation of Miranda — are admissible as impeachment evidence.").

### C. No Evidentiary Hearing is Required

The district has discretion to deny a motion to suppress without an evidentiary hearing if the defendant fails to support the motion with specific facts. United States v. Batiste, 868 F.2d 1089, 1092 & n.5 (9th Cir. 1989); see also United States v. Wardlow, 951 F.2d 1115, 1116 (9th Cir. 1991) (affirming district court's denial of evidentiary hearing because requirements of Central District Local

Rule not met by declaration of counsel containing broad assertion that the statement of facts in a memorandum of points and authorities was based on discovery received by counsel).  Here, defendant has not submitted factual evidence in support of his motion beyond a declaration of counsel describing certain undisputed case-related facts or asserting legal conclusions.  See, e.g., Arnold Decl. ¶ 7 (relying on "information and belief" to conclude the interrogation was custodial).  Certain factual assertions within the motion (see Mtn. at 5) are without any support or citation and amount to conjecture of counsel.  Defendant should not be permitted to create factual disputes on reply, especially where the Local Rules required him to submit with his motion to suppress his own declaration "setting forth all fact then known upon which it is contended the motion should be granted."  Local Cr. R. 12-1.

On this record, defendant has not created any factual dispute that could be resolved by an evidentiary hearing.  Accordingly, the Court need not conduct one.  To the extent the Court conducts an evidentiary hearing, defendant should be required to identify those factual matters that are in dispute and the evidence that puts those facts into dispute before the hearing commences.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to suppress.